AZRACK, J.

FILED
CLERK

2015 OCT 19  PM 3: 31

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHIELDS, M.J.

LONG ISLAND HOUSING SERVICES, INC.,
PHILIP KNEER, and PATRICIA FLYNN-
KNEER,

Plaintiffs,

v.

GERMAN-AMERICAN SETTLEMENT
LEAGUE, INC.,

Defendant.

COMPLAINT

CV 15       5987
5 Civ. _____

DEMAND FOR JURY

Plaintiffs Long Island Housing Services ("LIHS"), Philip Kneer, and Patricia Flynn-

Kneer, by their attorneys Emery Celli Brinckerhoff & Abady LLP, respectfully allege as follows:

## INTRODUCTION

1.      The racially discriminatory housing policies of Long Island's German-American

Settlement League ("GASL") are wrong and unlawful. The GASL owns Siegfried Park in

Yaphank, Long Island, where, in the late 1930s, German Americans traveled to rally together in

support of Nazism.  GASL still displays one of the Hitler Youth emblems, modified with a

shovel across it, on top of a flagpole flying the German flag in its clubhouse at Siegfried Park. [1]

The same modified Hitler Youth emblem originally was used in the 1930s at Siegfried Park

during ceremonies and marches.[2]  At least through the 1980s, GASL used the same emblem as a

logo on its stationery.[3]

2.      Since its incorporation in 1937, the GASL has excluded non-whites from its

membership, recreational programs, and summer homes in favor of new residents with German

---

[1] Compare Exhibit A (Boy wearing Hitler Youth uniform, 1934, United States Holocaust Museum
Memorial) to Exhibit B (Photograph of flagpole with German flag in Siegfried Park clubhouse, 2015).

[2] See Exhibit C, *Italian Black Shirts March at Camp Siegfried.* Credit:  Federal Bureau of Investigation.

[3] See Exhibit D, Letter from GASL President to members, dated April 2, 1984.

1

ancestry.  As stated in its Constitution, one of the purposes of the GASL is to "introduce, cultivate, and propagate in every direction true Germanic culture and to cultivate the German language, customs and ideals."

3.      Now, GASL rents lots on an annual basis to its members who live year-round in Siegfried Park in single-family homes.  GASL ensures that Siegfried Park remains a white and German residential community by enforcing a number of rules that restrict homeownership to members who are required "primarily" to be individuals "of German extraction."  New members must be sponsored by a current member and accepted by a majority vote of the Board and membership. GASL membership may be extended under limited circumstances to "other national elements" only if they are sponsored by current members, all of whom are white.

4.      GASL prohibits its members from renting their homes and from publicly advertising homes for sale.  Instead, GASL members are only permitted to list their homes for sale in the minutes of GASL Board meetings which are distributed by hand to GASL members.

5.      Philip Kneer and Patricia Flynn-Kneer are white American citizens of German ancestry who have owned a home at Siegfried Park since 1999.  For at least the past six years, the Kneers have tried to sell their home to no avail because of GASL's racially restrictive policies.  When Phil Kneer inquired in 2014 about these policies, GASL's President told Mr. Kneer that the Board was not going to change its rules because the members wanted to keep Siegfried Park the way it is.

<b>JURISDICTION AND VENUE</b>

6.      This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 42 U.S.C. § 3613, and supplemental jurisdiction over the New York State law claims pursuant to 28 U.S.C. § 1367.

2

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant GASL is incorporated in the State of New York, the property that is the subject of the action is situated in this District, and the events giving rising to the claims occurred in this District.

## THE PARTIES

8.     Plaintiff LIHS is a private non-profit fair housing advocacy organization serving Long Island, New York and organized under the laws of New York, with its principal place of business in the Eastern District of New York.  LIHS is dedicated to ensuring that all people have equal access to housing opportunities on Long Island.  LIHS expended staff time and other resources to investigate and respond to Defendant's discriminatory practices, which diverted resources away from other LIHS activities.  Furthermore, Defendant's discriminatory policies frustrate LIHS's mission to ensure that all people have equal access to housing opportunities on Long Island by, among other things, making housing unavailable because of race or national origin.

9.     The primary objectives of LIHS are to (a) promote equal housing opportunity and racial and economic integration; and (b) reduce and eliminate housing discrimination.  These objectives include ensuring that people of all races and national origins have equal access to housing in Long Island.  LIHS pursues these goals by providing counseling services to individuals and families about fair housing and landlord/tenant rights, homelessness prevention, mortgage default, pre-purchase and rental strategies, and government assisted housing programs. LIHS promotes compliance with fair housing laws by (a) conducting fair housing investigations; (b) assisting victims of discrimination to file administrative complaints or judicial complaints and making referrals for legal representation; (c) providing education and outreach for both

housing consumers and industry-related providers; and (d) serving as a clearinghouse for housing-related information.

10. Plaintiffs Philip Kneer and Patricia Flynn-Kneer (collectively "the Kneers") are a married couple and are both white American citizens of German ancestry. Since 1999, they have owned a home in Siegfried Park and been members of the GASL. They rent the lot of land on which their home is situated from the GASL. The Kneers currently live outside of the District and the State of New York.

11. Defendant GASL is a New York corporation. GASL owns the Siegfried Park property in Yaphank, New York where the Kneers own a house. GASL rents approximately fifty (50) lots of land in Siegfried Park to GASL members, including the Kneers. The lots owned by GASL in Siegfried Park—on which GASL members individually own single-family houses—constitute "dwellings" within the meaning of 42 U.S.C. § 3602(b) and "housing accommodations" within the meaning of New York Executive Law § 290 and Suffolk County Local Law § 528-6.

## FACTS

### *The Founding and Racially Discriminatory Practices of the German-American Settlement League*

12. GASL has owned the Siegfried Park property in Yaphank, New York since its incorporation in 1937. Siegfried Park was originally owned by the German-American Bund party, an American organization that supported the principles of Nazism. Siegfried Park operated as a summer camp starting in 1935. The land was later transferred to the GASL upon its incorporation in 1937. As the manager of what was then called Camp Siegfried explained, all members of the German-American Bund party were eligible for membership in the GASL, as

well as all other "national-minded American citizens of Aryan blood."[4] The adjoining 40-acre

residential real estate subdivision originally included thoroughfares named Hindenburg street,

Goering street, Goebels street, Adolf Hitler street, and German boulevard.

13.     Siegfried Park is now a year-round residential community with approximately

fifty (50) homes.  All home owners must be members of GASL.  In addition, GASL membership

is open to those individuals who do not currently own a home within the community, but first

became members on or prior to August 24, 1952.

14.     Since its incorporation, GASL's goals—enshrined it its Articles of Incorporation,

Constitution and By-laws—included "introduc[ing], cultivat[ing], and propagat[ing] in every

direction true Germanic culture [and]. . . the German language, customs and ideals."

15.     Until 1940, GASL received funding from the German-American Bund party.

During that time, German-American families traveled to Siegfried Park, then known as Camp

Siegfried, to attend rallies and marches in support of Nazism.  At the Camp, Nazi flags were

hung, pictures of Hitler were displayed, and a garden was planted in the shape of a swastika.

Campers, wearing the uniform of the Bund party, would gather on the parade grounds to listen to

speeches condemning Jews and exalting German heritage.

16.     A single Sig Rune symbol, one of the emblems of the Hitler Youth,[5] modified

with a shovel across it, still sits on top of a flagpole flying a German flag in the GASL clubhouse

in Siegfried Park.  This same modified single Sig Rune symbol was used by GASL as a logo on

its stationery and printed on the cover page to GASL's 1984 Constitution and By-Laws.

---

[4] See Exhibit E, "Says Siegfried Camp Members All Are U.S. Citizens," *Mid-Island Mail* (June 1, 1938), available at http://170.161.70.116/history/yaphank/bund25.htm.

[5] A double Sig Rune symbol was used in Hitler-led Germany by the SS as its insignia.  Membership in the SS was restricted to those of white Aryan origin.  The SS, a para-military group, controlled the German police forces and the concentration camp system.  United States Holocaust Museum, Holocaust Encyclopedia, available at (http://www.ushmm.org/wlc/en/media_ph.php?MediaId=7397).

17.     Even today, GASL explicitly incorporates membership requirements based on race and national origin.  According to its 1998 Constitution and By-Laws, still in effect, membership in GASL is "primarily" open to people who are "21 years of age or older, of German extraction and of good character and reputation."  Membership is also open to children of members, and it "may also be extended to other national elements" if they meet the age and character requirements, and if a current member sponsors their membership.[6]  These criteria alone expressly violate the Fair Housing Act's prohibition on indicating a "preference, limitation, or discrimination" based on race or national origin.  When combined with the GASL's other restrictions on membership, leasing, and resale of homes described below, the criteria unlawfully discriminate because they serve as a barrier to prospective home buyers who are not white people of German ancestry or background.

18.     Upon information and belief, GASL has never granted full membership to any non-white individual.  All homeowners in Siegfried Park currently are and always have been white.

19.     For more than thirty years, GASL has offered vacant land in Siegfried Park for lease solely to GASL members for the purpose of constructing and maintaining year-round residences.  Siegfried Park residents own the home on their rented lots as personal property.

20.     Everyone who owns a home in Siegfried Park is required to be a member of GASL.  If an individual who is not a member buys a home in Siegfried Park, GASL will refuse to rent land to the purchaser.  Instead, the purchaser must sell his interest to a member of GASL, remove the home from Siegfried Park, or give the home to GASL.  A non-member simply cannot be a homeowner in Siegfried Park.

---

[6] Exhibit F, Constitution and By-Laws of the German-American Settlement League, Inc., 1998.

6

21.     As described above, GASL's membership policies control who may purchase a dwelling in Siegfried Park by race and national origin.  Indeed, the homeowner application for Siegfried Park and the membership application for GASL are one and the same.

22.     An applicant for homeownership/membership also must be sponsored by someone who is himself a homeowner/full member in good standing with GASL.  On the homeowner/membership application, the sponsor must state his relationship to the applicant and the number of years he has been "acquainted with the applicant."  He must also sign a statement on the application certifying that he is "well acquainted with the applicant" and that he believes the applicant "to be of good character and reputation."

23.     In addition to the sponsorship requirement, a majority of the Board of Directors, as well as a majority of current members, must approve a prospective member's application. Members entitled to vote on membership applications include those members who do not own homes in Siegfried Park, but whose membership began on or prior to August 24, 1952.

24.     If a member wishes to sell his home in Siegfried Park, he may post a notice in the "community bulletin" which includes minutes of GASL Board of Directors' meetings.  This bulletin is only distributed by hand to GASL members.  GASL By-Laws prohibit members from advertising the sale of their homes in any publication, including any "consumer or trade journals" such as a multiple listing service, and from erecting any for-sale sign.

*The Kneers' Experience Applying for GASL Membership*

25.     In 1999, while engaged to be married later that year, the Kneers bought a home in Siegfried Park and became members of GASL.  The Kneers had never owned a home before and learned about the home through a family friend who had inherited the house when her mother passed away.  The Kneers entered into a five-year monthly installment agreement with the seller

7

to purchase the home, contingent on becoming members of the GASL.

26.     The seller was aware that Mr. and Mrs. Kneer each had German heritage.  Mrs. Kneer is German on her mother's side and Irish on her father's side.  Mr. Kneer is German on his father's side and Irish and French on his mother's side.  The seller told the Kneers that GASL sought people with German backgrounds to live in the neighborhood.

27.     During the application process to become homeowners/members, the GASL "Investigating Committee" comprised of Board members and homeowners inquired about the Kneers' ethnicity.  GASL members were impressed that Ms. Kneer's mother was originally from Berlin, Germany.

28.     Despite GASL's sponsorship "requirement," the Kneers' sponsor for homeownership/membership was not anyone they knew, but rather a GASL member whom the seller knew and asked to be the sponsor.  The Kneers met this sponsor for the first time on the same day that GASL voted on their membership application.

29.     The Board President met the Kneers in person at the initial interview for GASL membership.  As soon as he met them and could ascertain the Kneers' race, the Board President told the Kneers they did not have to be interviewed.  Only when Ms. Kneer requested that they be interviewed was an interview conducted by the GASL Board.

### *The Kneers' Efforts to Sell Their House*

30.     After the Kneers' two daughters were born, they decided to sell their small two-bedroom one-bathroom house in Siegfried Park so they could purchase a larger home outside of Siegfried Park.  In order to have sufficient financial resources to buy a home, the Kneers needed to first sell their Siegfried Park house.  They did not have the option of renting the house because their lease with GASL prohibited, and continues to prohibit, leasing.

31.     GASL's policies also prohibited, and continue to prohibit, the Kneers from placing a for-sale sign in their yard or on their house, or advertising their home for sale in any publication, such as a multiple listing service. The GASL By-Laws limit the Kneers to listing the availability of their home for sale in the GASL's internal community bulletin. Moreover, any potential buyer must be approved by a majority of the GASL members and Board of Directors and would need to be sponsored by a GASL member. GASL's restrictive membership, advertising, and leasing policies have rendered the Kneers unable to sell or rent their house.

32.     Upon information and belief, lenders are reluctant to provide mortgages to purchase homes at Seigfried Park because of, among other things, GASL's preference for German purchasers, restrictive membership and advertising requirements, and ban on leasing.

33.     Over the past six years, including during 2015, the Kneers have advertised the availability of their house for sale in the only way permitted by GASL's By-Laws, by posting an announcement in the minutes of the meetings for the GASL Board of Directors. Despite these efforts, they have been unable to sell their home.

34.     As recently as 2014, Phil Kneer spoke with GASL's Board President about GASL's advertising restrictions and the inability of buyers to obtain a mortgage because of the restrictions on resale. The Board President told Mr. Kneer that these rules were not going to be changed because the members wanted to keep it the way it is.

35.     At a general membership meeting held in September 2014, GASL members rejected a motion to permit signs stating "house for sale."

***The Kneers Contact Long Island Housing Services about GASL***

36.     In March 2015, the Kneers contacted LIHS to complain of housing discrimination based on race and national origin by GASL. The Kneers requested assistance from LIHS to

change GASL's by-laws and policies to allow them to sell their home without any discriminatory restrictions.

37.     In response to the Kneers' complaint, LIHS staff, among other things, interviewed the Kneers multiple times, collected and reviewed relevant documents from them, performed online research about GASL, obtained and reviewed public documents about the corporation, and conducted other research to identify GASL's policies and practices.

38.     As of this date, the Kneers have been unable to sell their home in Siegfried Park because of the GASL's discriminatory restrictions on ownership.

39.     Frustrated with GASL's refusal to change its By-Laws and with their continued inability to sell their house in compliance with these restrictive By-Laws, the Kneers have rented a home outside of Siegfried Park and moved in October 2015.

### FIRST CAUSE OF ACTION
Civil Rights Act of 1866
(42 U.S.C. § 1982)

40.     The Plaintiffs repeat and reallege the foregoing paragraphs of this complaint as though fully set forth herein.

41.     The Civil Rights Act of 1866, Section 1982, provides in relevant part, "[a]ll citizens of the United States shall have the same right . . . as is enjoyed by white citizens thereof to . . . purchase, lease, sell, hold and convey real and personal property."  By engaging in the foregoing discriminatory conduct, Defendant GASL has violated the Civil Rights Act of 1866, Section 1982.

42.     The Plaintiffs have been injured by Defendant GASL's discriminatory conduct and have suffered damages as a result.

43.     Defendant GASL's conduct has been intentional, willful and done in reckless

10

disregard of the rights of the Plaintiffs.

44.     Accordingly, the Plaintiffs are entitled to actual and punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
Fair Housing Act
(42 U.S.C. § 3601 *et seq.*)

45.     The Plaintiffs repeat and reallege the foregoing paragraphs of this complaint as though fully set forth herein.

46.     Defendant's conduct as described above constitutes otherwise making unavailable or denying a dwelling because of race or national origin in violation of 42 U.S.C. § 3604(a).

47.     Defendant's conduct as described above constitutes discrimination in the terms, conditions, or privileges of sale or rental of a dwelling because of race or national origin in violation of 42 U.S.C. § 3604(b).

48.     Defendant's conduct as described above constitutes making statements with respect to the sale or rental of a dwelling that indicate a preference, limitation, or discrimination based on race or national origin or an intention to make such preference, limitation, or discrimination in violation of 42 U.S.C. § 3604(c).

49.     Plaintiffs are each aggrieved persons as defined in 42 U.S.C. § 3602(i), have been injured by Defendant's discriminatory conduct, and have suffered damages as a result.

50.     Defendant GASL's conduct has been intentional, willful and done in reckless disregard of the rights of the Plaintiffs.

51.     Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual and punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION
New York State Human Rights Law
(New York Executive Law § 290 *et seq.*)

52.　The Plaintiffs repeat and reallege the foregoing paragraphs of this complaint as though fully set forth herein.

53.　Defendant GASL's conduct as described above constitutes discrimination because of race or national origin "in the terms, conditions or privileges of the sale, rental or lease" of a housing accommodation in violation of Article 15 of the New York Executive Law § 296(5)(a)(2).

54.　Defendant GASL's conduct as described above constitutes the printing or circulating of a statement "in connection with the prospective purchase, rental or lease" of a housing accommodation that expresses a limitation, specification, or discrimination as to race or national origin in violation of Article 15 of the New York Executive Law § 296(5)(b)(3).

55.　Plaintiffs have been injured by Defendant GASL's discriminatory conduct and have suffered damages as a result.

56.　Defendant GASL's conduct has been intentional, willful and done in reckless disregard of the rights of the Plaintiffs.

57.　Accordingly, under Article 15 of the New York Executive Law § 297, Plaintiffs are entitled to actual and punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

### FOURTH CAUSE OF ACTION
Suffolk County Human Rights Law
(Suffolk County Local Law Chapter 258-9)

58.　The Plaintiffs repeat and reallege the foregoing paragraphs of this complaint as though fully set forth herein.

59.     Defendant GASL's conduct as described above constitutes discrimination because of race or national origin "in the terms, conditions or privileges of the sale, rental or lease" of a housing accommodation in violation of Chapter 528 of the Suffolk County Human Rights Law § 528-9(A)(2).

60.     Defendant GASL's conduct as described above constitutes the making, printing or publishing of a statement "in connection with the prospective purchase, rental or lease" of a housing accommodation that expresses, directly or indirectly, a limitation, specification, or discrimination as to race or national origin in violation of Chapter 528 of the Suffolk County Human Rights Law §528-9(A)(7).

61.     Plaintiffs have been injured by Defendant GASL's discriminatory conduct and have suffered damages as a result.

62.     Defendant GASL's conduct has been intentional, willful and done in reckless disregard of the rights of the Plaintiffs.

63.     Accordingly, under Chapter 528 of the Suffolk County Human Rights Law, Plaintiffs are entitled to actual and punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against the Defendant as follows:

(a)     Declaring that Defendant's policies and practices violate the Civil Rights Act of 1866, 42 U.S.C. §1982; the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.*; the New York State Human Rights Law, New York Executive Law § 290 *et seq.*; and the Suffolk County Human Rights Law, Suffolk County Local Law § 528;

13

(b)    Enjoining Defendant and its officers, members, agents, employees, and successors, and all other persons in active concert or participation from:

    (i)    denying or withholding housing, or otherwise making housing unavailable, because of race or national origin;

    (ii)    discriminating in the terms, conditions or privileges of the sale, rental or lease of housing because of race or national origin;

    (iii)    making, printing or publishing a statement in connection with the prospective purchase, rental or lease of housing that expresses, directly or indirectly, a limitation, specification, or discrimination based on race or national origin, or an intent to discriminate because of race or national origin;

(c)    Awarding such damages to Plaintiff LIHS as will fully compensate for the diversion of resources and frustration of mission caused by the Defendant's unlawful practices;

(d)    Awarding nominal compensatory damages to Plaintiffs Philip Kneer and Patricia Flynn-Kneer for their loss of civil rights;

(e)    Awarding punitive damages to Plaintiffs;

(f)    Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

(g)    Granting Plaintiffs such other further relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial on the merits by jury pursuant to Rule 38, Federal Rules of Civil Procedure.

Dated:  October 19, 2015

EMERY CELLI BRINCKERHOFF
& ABADY LLP


By: _____
　　　Diane L. Houk
　　　O. Andrew F. Wilson
　　　600 Fifth Avenue, 10th Floor
　　　New York, New York 10020
　　　Telephone: (212) 763-5000
　　　Facsimile: (212) 763-5001

*Attorneys for Plaintiffs*

# Exhibit A

This is a non-interactive version of the online exhibitition. Go to the interactive version of this page

**TIMELINE   THEMES   ARTIFACTS GALLERY**



### A member of the Hitler Youth

A Hitler Youth poses for a photograph in the Rhineland city of Bruehl, 1934. In 1936, membership in Nazi youth groups became mandatory for all boys and girls between the ages of ten and seventeen.

Bildarchiv Preussischer Kulturbesitz, Berlin / Art Resource, New York

See All Artifacts

# Exhibit B



# Exhibit C



Italian Black Shirts March at Camp Siegfried. Credit: Federal Bureau of Investigation.

# Exhibit D



## German American Settlement League, Inc.

P. O. Box 444   ::   Yaphank, N.Y. 11980

April 2, 1984

Dear Members and Associate Members:

We, the Board of Directors, are sending to each of you an updated copy of the <u>Constitution and By-Laws of the German-American Settlement League, Inc.</u>

These By-Laws were approved in September 1983 and include all but two approved amendments.  These two approved amendments are:

Change in Article X, Section 2 - Directors

"The Board of Directors are to be changed from six in number to nine in number over a three-year period." Approved at the General Membership Meeting - 9/2/78.

Change in Article X, Section 4

Article X, Section 4 is changed to read:

"Each director shall serve for the term for which he shall have been elected or appointed.  He shall be ineligible for re-election as a Director at the election meeting at which time his term has expired." Approved at the General Membership Meeting - 9/17/83.

This letter is considered to be a part of the "By-Laws" in that it addresses items not covered in the printed By-Laws.  In the future, when additional amendments or other changes are required, the above amendments will be incorporated into a new printed edition.

Thank you,

Herbert Gloede

Herbert Gloede
President

HG:CJ
Enc.

# Exhibit E

# Mid-Island Mail

### June 1, 1938

## Says Siegfried Camp Members All Are U. S. Citizens

### Hauck, Mgr., Explains System, Invites Full Inspection

Says Alien Prospects Are Trained For Naturalization — Calls Uniformed Group Ushers Unarmed— No Oath Requirement

INSOFAR as the citizenship of its members is concerned, Camp Siegfried at Yaphank, target of a variety of attacks during the past year, is American, because one cannot become a member—either guest or benevolent—unless he or she is a citizen of the United States.

This was the statement made by Henry Hauck, manager of Camp Siegfried, during an interview Thursday with a reporter of this paper.

In his detailed account of the camp and its activities, Mr. Hauck explained that all members of the German-American Bund are eligible to membership in the camp, as well as all other "national-minded American citizens of Aryan blood."

Referring to the German-American bund, he said that one of the requirements for membership in the bund is that the applicant must be an American citizen and that prospective bund members, who are not citizens, are turned over to a bund auxiliary, known as the prospective

(Continued on page 2)

# Says German Camp Members Are Citizens

(Continued from page 1)

citizens' league, which teaches such persons the fundamentals of citizenship and otherwise prepares them for naturalization.

### "No German Oath"

"Does membership in the German-American bund require an oath of allegiance to Germany?" the reporter asked.

"Absolutely not," Mr. Hauck replied. "If it did we would not be in that organization. We gave an oath as citizens of the United States and we would not break that oath."

Asked if members of the German-American bund are required to take any kind of an oath on joining the organization, Mr. Hauck replied, "None whatsoever."

Aside from the fact that German-American bund members are automatically eligible to membership in Camp Siegfried, there is no other connection, he said, between the bund and the camp. The Yaphank camp, established in June, 1935, is owned by the German-American Settlement League, Inc., which operates no other camp in this country.

The league purchased the camp a year ago after it had been operated by the original owners for two years. The camp site consists of 46 acres, about one-third of which is marshland, at Yaphank lake. On the opposite side of the lake is a ten-acre site used as a camp for boys and girls of German-American extraction. The youths' camp, has no direct connection with Camp Siegfried, Mr. Hauck said. It has never had more than 350 young people in it at any one time.

The German-American Settlement League, Inc., a membership corporation, is made up of 400 benevolent members, which is allowed under the law. There is also the guest type of membership, the $1.25 annual dues for which entitles the holder to the general privileges of the park.

Because of the limited parking space on busy Sundays, when unusually large crowds visit the camp and parking places are made, season guest cards, costing $1.25, are issued to non-members. These cards cover only parking privileges.

No cards or passes are required of persons entering the camp or its recreation field.

Male members, who serve as ushers at the camp, are uniformed. These men, who have never exceeded more than 300 in number at any time, Mr. Hauck said, drill at regular intervals. No arms are used at any time, he added.

### Non-political, He Says

Declaring that the purpose of the camp is for recreational and social purposes, Mr. Hauck said that it is non-political. The camp members, however, take a vigorous stand against Communism.

Referring to parades in which the camp members participated in the past and which have since been abolished, Mr. Hauck pointed out that "we didn't parade for the sake of parading, but merely to bring peo-

ple from the train to the camp in orderly fashion." Busses are now used to transport these people, he said.

"Our people are urged that, when outside the camp grounds in Yaphank, they should respect the property of others and not trespass," Mr. Hauck said. "In fact, when Judge Neuss was in office, Ernst Mueller, league president, and I went to him and told him that if any of our camp visitors were caught violating any laws, they should be punished severely, so that law and order would be preserved in Yaphank.

"In reference to merchandise delivered to our camp," he said, "it has been alleged that a tax is collected by the camp at the entrance. Various merchants make deliveries at the camp, the only requirement being that they obtain permission from the manager. No tax of this kind has ever been collected from anyone. If there has, we would like to have the name of the person by whom it was paid."

### No Secrecy Any Time

Mr. Hauck said there is no secrecy about the camp, that it is open for inspection by outsiders at any time. "We would like the persons desiring to look over the camp to come here with a suspicious viewpoint," he said. "We will take them around and show them anything they wish to see.

"Are the camp members and visitors supporters of Nazi ideas?" the reporter inquired.

"Generally speaking, yes," was the reply, "but only as they concern Germany, not the United States."

"Have public speakers at the camp expressed praise of the Hitler movement?"

"Some public speakers there," Mr. Hauck replied, "have praised the Hitler movement, but only as it concerns Germany."

In conclusion, he said that camp visitors are not required to speak German while there.



*Click Here For Homepage*

# Exhibit F

# CONSTITUTION AND BY-LAWS OF THE "GERMAN-AMERICAN SETTLEMENT LEAGUE, INC."

This edition of the G.A.S.L., Inc. By-Laws / Constitution was accepted as written by the Membership at the Annual General Membership Meeting held on May 30th, 1998.

# CONSTITUTION AND BY-LAWS OF THE
# "GERMAN-AMERICAN SETTLEMENT LEAGUE, INC."

## ARTICLE I

**Sec. 1** This organization shall be known as the GERMAN-AMERICAN SETTLEMENT LEAGUE, INC., in accordance with its charter, duly filed with the Secretary of State of the State of New York.

**Sec. 2** The use of the words he, him, his, himself shall mean the same as she, her, herself.

## ARTICLE II

**Sec. 2.** The objects of the Corporation are:

To introduce, cultivate, and propagate in every direction true Germanic culture and to cultivate the German language, customs and ideals;

To promote the social, physical and mental welfare of its members by offering them adequate recreation facilities and enjoyment;

To enlighten them in the true spirit of they're civic obligations and the cardinal principles of American Citizenship;

To establish among them high standards of good conduct, deportment, honor and integrity;

To promote and inculcate in its youth a spirit of loyalty, love for the country, respect for the flag of the United States, and to train and instruct them in the theory and practice of good citizenship;

To encourage science and art, and disseminate literature for the purpose of teaching the true ideals of benevolence, charity and philanthropy;

To aid, protect and otherwise assist its members and their families or those dependent upon them in case of distress caused by sickness, unemployment or otherwise, and to generally alleviate their suffering and prevent them from becoming prey to poverty.

To aid and assist worthy charitable institutions, communities, societies or hospitals and to generally dispense its funds for purposes consistent with the aims and objects here in before stated and in accordance and in conformity with such by-laws, rules and regulations as the Corporation may from time to time enact.

## ARTICLE III

## MEMBERSHIP

**Sec. 1.** Membership in the German-American Settlement League, Inc. is primarily open to all persons over 21 years of age or older, of German extraction and of good character and reputation. Membership is open to children of members who are 18 years of age or older. Membership may also be extended to

other national elements filling otherwise the above requirements of the membership application. Membership in the G.A.S.L., Inc., is available as A) Member and B) Associate Member, the specific requirements of each are as follows:

**a.) MEMBER:**
A Member is a person who in addition to meeting the general requirements of membership, owns or jointly owns with another Member an existing house or bungalow on the property of the G.A.S.L., Inc. in Yaphank, L.I., N.Y.

If a Member is the sole owner of a house or bungalow, Member status may be extended to one member of the sole owners' immediate family, provided the prospective member conforms to all other requirements of membership.

Members whose membership began on or prior to August 24, 1952, and is now and has been in good standing continuously and without interruption since August 24, 1952 shall be considered as Members without the requirement of house or bungalow ownership on the property of the corporation.

Member status will terminate when compliance with any or all of the here before described requirements ceases.  A Member who voluntarily terminates his Member Status may remain as an Associate Member.

**b.) ASSOCIATE MEMBER:**
An Associate Member is a member who fulfills all the requirements of membership except the requirements for ownership of a house or bungalow on the property of the G.A.S.L., Inc. Associate Members may not serve on the Board of Directors, and do not have voting privileges.

Whenever reference is made herein to the "immediate family", it shall be construed to mean – father, mother, husband, wife, son or daughter.

Sec. 1.  Application for homeownership / membership must be made on the official membership application form, accompanied by credit report, photo I.D.

Sec. 2.  Each application for membership as either Member or Associate Member shall be investigated and approved by the Board of Directors. Investigating committee shall consist of a Minimum of 1 Board of Director and 2 homeowners.

A majority vote by the Board of Directors is required for approval of any application.

Final acceptance of new members for Homeownership / Full Member Status shall be by majority vote of Members at a general meeting.   The applicant must be present at the general meeting and is to be introduced to the membership, once the applicant has been accepted by the majority vote, at that time the initiation fee and dues are to be submitted to the Treasurer, one initiation fee is to be paid per house. Final acceptance of Associate Members shall be by the Board of Directors.

Page 2

Sec. 3.  An applicant may consider himself admitted to the German-American Settlement League, Inc. as soon as he received his membership card signed and approved by the President or his accredited representative. A rejected applicant will be notified in writing without stating any reason for rejection.

Sec. 4.  Resignation from membership of this organization should be made in writing and submitted to the Secretary.

## ARTICLE IV
### Duties of Members

Sec. 1. It shall the duty of Members and Associate Members to conduct themselves in a proper manner so as not to bring the organization into discredit; to act loyally with respect to the organization, its officers and members; to fully support all such measures as tend to add to the prosperity and reputation of the organization.

Sec. 2. It shall be the duty of Members and Associate Members to support and obey the Constitution and By-Laws of the Organization and to yield to the decision of the majority, to pay the dues and community assessments promptly when due, to make use of the means the Organization offers for their physical and mental development; to attend as far as possible the meeting called, and to assist the officers in the fulfillment of their duties.

Sec. 3. It is the duty of members to inform the Organization's secretary immediately of any change of address, submit change of address in writing to the secretary.

Sec. 4. A member may be expelled because of acts dishonorable and disgraceful in nature and character; for acts contrary to the principles, aims and purposes of the Organization; for scandalous and offensive acts tending to injure the reputation and the esteem of the Organization; no immoral, improper, offensive or unlawful use shall be made of the property nor any part thereof and all valid laws, zoning ordinances and regulations of all governmental bodies having jurisdiction thereof shall be observed; for default in payment of membership dues and or community assessments if such default is not sufficiently excused, or for knowingly and willfully giving false information in the application for membership.

## ARTICLE V

### Rights of Members

Sec. 1. All members have equal rights; i.e. to take part in meeting by voice or vote; to make motions, complaints, charges  addresses; to use the property of the organization for purposes it is destined for, and are eligible for any office provided they meet the qualifications of that office except that Associate Members do not have the right to vote and are ineligible for office.

Sec. 2. Every member of the Organization shall be entitled to a fair hearing for offenses involving reprimand, suspension or expulsion, except only for non-payment of dues or assessments.  No member shall have a hearing unless charges duly specifying the offenses, so as to fully apprise him of the nature thereof and enable him to prepare his defense.

Sec. 3. The Board of Directors shall have the power to suspend any member pending their hearing. If the charges are finally dismissed either after their hearing or after appeal, the member charged shall be reinstated to membership and all dues which may have accrued pending his suspension shall be remitted.

Sec. 4. Within three days after charges have been duly filed with the Secretary of the Organization, the Secretary shall forward a true written copy of same, and notice of the date and place set for the hearing to the accused by registered mail at his last known postal address. Within the same time the Secretary shall also notify the member or members preferring the charges of the time and place set for the hearing and such shall be the notice for the person presenting the charges to attend.
Such charges shall then be submitted to a permanent Inquiry and Arbitration Board of 5 members, appointed by the President and confirmed at a special Board of Directors Meeting.

Sec. 5. Such Inquiry and Arbitration Board shall meet at the time and place set for the hearing of the charges and shall report to the President upon the disposition of such charges.

Sec. 5. From the decision of the Organization Inquiry and Arbitration Board there will be no further appeal.  It is final.

## ARTICLE VI

### Membership Dues

Sec. 1. Membership dues are to be paid annually in advance (due January 1st of every year).  The amount of the annual membership dues shall be recommended by the Board of Directors and approved by the general membership. If a member does not pay their membership dues within 90 days, they in turn relinquish their membership status.

Sec. 2. Any person admitted to Homeownership / Full Membership, shall pay an initiation fee.  The amount of the initiation fees shall be recommended by the Board of Directors and approved by the Membership. Initiation fees will also apply when a  Homeowner / Full Member wishes to sell his/her existing house in order to purchase another house on G.A.S.L., Inc. property. Homeowners / members may not own more than one house on G.A.S.L.,Inc. property.

A person who takes over or inherits the ownership of a house or bungalow on the property of the corporation belonging to an immediate Member of his family shall be excused from paying this initiation fee.

## ARTICLE VII

### Annual Membership Meeting

Sec. 1.  The annual membership meeting shall be held in the second half of May at a date and hour to be fixed by the Board of Directors for the purpose of electing officers and for the transaction of such other business as may be brought before the meeting.

page 4

Sec. 2. It shall be the duty of the Organization's Secretary to cause notice of each annual meeting to be mailed/delivered to each member of the Organization at least thirty days before the date of the meeting.

Sec. 3. Special meetings may be held whenever called by the Board of Directors.  It shall be the duty of the Secretary to cause notice of such special meetings to be mailed/delivered to each member at least 10 days before the date of such meetings stating briefly the object or the objects thereof.

Sec. 4. At any duly called annual or special meeting, a majority vote of the Members present is sufficient for ratification of any business submitted to the membership and requiring the membership approval or disapproval, unless otherwise stated herein.

Sec. 5. A quorum shall exist in the annual or special meeting when 35% of the Members in good standing are present.

Sec. 6. Each Member with proper credentials shall be entitled to one vote.

## ARTICLE VIII

Sec. 1. The order of business at any meeting shall be as follows:

1.  Pledge to the Flag
2.  Roll Call of Members
3.  Silent Prayer for Departed Members
4.  Reading of Minutes of Previous Meeting
5.  Treasurer's Report
6.  Sickness and Distress
7.  Committee Reports
8.  Petitions for Membership
9.  Balloting for Membership
10. Reading of Correspondence
11. Unfinished Business
12. New Business
13. Good & Welfare
14. Adjournment

## ARTICLE IX

Sec. 1. The sequence of the above Order of Business may be altered or amplified by the majority consent of the Members at any  Meeting.

Page 5

## ARTICLE X

### BOARD OF DIRECTORS

Sec. 1. The business and the property of the German-American Settlement League, Inc., shall be controlled by the Board of Directors. The Board of Directors is responsible for the management of all the affairs of the Corporation, including its purchases or sales of property which must be approved by 2/3 of the membership, and the execution of legal instruments with or without the corporate seal in such manner as is deemed best and most advantageous for the interest of the Corporation. Increases in annual fees shall be recommended to the homeowners/membership and approved by the general membership.

Sec. 2. <u>Directors</u>  The President, the Vice President, the Treasurer, and the Secretary are automatically members of the Board of Directors during their term of office.

Other Directors, six in number shall be elected at the Annual Membership Meeting, and shall be classified in respect to the time for which they shall severally be elected, by dividing them into three classes, each class consisting of the whole number elected. Each director shall serve for the term for which he shall have been elected or appointed. He shall be ineligible for re-election as a Director at the election meeting at which time his term has expired, but may be elected again the following year.

Sec. 3. The number of Directors may be altered from time to time by the alteration of the by-laws.

Sec. 4. Each Director shall serve for the term for which he shall have been elected, and until his successor shall have been duly chosen.

Sec. 5. In case of any vacancy through death, resignation, disqualification, or other cause, the remaining Directors, by affirmative vote of a majority thereof, may elect a successor to hold office as a Director for the unexpired portion of the term of the Director whose place shall be vacant, and until the election of his successor.

Sec. 6. <u>Place of Meeting, etc.</u>  The Board of Directors may hold their meeting and may have an office and keep the books of the corporation (except as otherwise may be provided for by law) in such place or places in the State of New York as the Board from time to time may determine.

Sec. 7. <u>Regular Meetings</u>  Regular meetings of the Board of Directors attended by a least 7 of the 10 Directors of the Corporation (and the various committee chairmen whenever problems for discussion require their presence) shall be held monthly.

Sec. 8. <u>Special Meeting</u>   Special meetings of the Board of Directors shall be held whenever called by the direction of the President.  The Secretary shall give notice of such special meeting by mail/delivered the same at least five days delivered before the meeting, or by telephoning the same at least one day before the meeting to each member of the Board.  Unless otherwise indicated in the notice thereof, any and all business may be transacted at a special meeting.  At any meeting at which at least 7 of the 10 Directors shall be present, even though without notice, any business may be transacted.

Sec. 9. <u>Order of Business</u>   At meetings of the Board of Directors, the President shall preside.  He will vote only if votes of other Directors are tied.

Sec.10. <u>Contracts</u>   Except for programs requiring contracts or acts necessary for the proper maintenance of the corporate property, the Board of Directors shall submit all programs and acts which upon final completion require a total capital expenditure in excess of $5,000 (Five Thousand Dollars) for approval or ratification by the membership. A program or act shall be construed to mean an effort by the Corporation resulting upon completion of the program and beneficial occupancy by the Corporation on an increase in value of the Corporation's property, real or otherwise.  Any contract or act that shall be approved or ratified by the Members at a meeting shall be as valid and binding upon the Corporation and upon all the Members as though it has been approved by every Member of the Corporation.
When finally executing such approved and ratified contract or act, it shall be signed by the President with or without the Corporate Seal , and by either the Treasurer, the Vice President, or the Secretary, and shall be witnessed by two other Directors of the Corporation.

Sec. 11. The Board of Directors may designate an Assistant Treasurer and an Assistant Secretary.

Sec. 12. All members of the Board of Directors shall be citizens of the United States of America.

## ARTICLE XI

## OFFICERS - NUMBER - TERMS OF OFFICE - DUTIES, ETC.

President
Vice-President
Treasurer
Secretary

All of whom shall be elected by the Annual Membership Meeting for the term of one year, i.e., from the date of election to the next Annual Membership Meeting.

Sec. 2. One person may not hold more than one office.

Sec. 3. Any officer shall be subject to removal at any time by the affirmative vote of a majority of the Annual or a Special Membership Meeting.

page 7

Sec. 4. In case of any vacancy through death, resignation, disqualification, or other cause, the President shall assume the vacant office until nomination and election of a new officer by a Membership Meeting for the unexpired portion of the term.

Sec. 5. Each Officer of the Corporation shall devote his time, skill and energy to the affairs of the Corporation, unless the contrary is expressly consented to by the membership.

Sec. 6. Powers and Duties of the President  The President shall preside at all meetings of Members and the Board of Directors. By virtue of his office he shall have general charge of the Corporation. He may sign and execute all authorized, affirmed or ratified contract or acts, checks and other obligations, together with either the Vice President, the Treasurer or the Secretary of the Corporation. He shall do and perform such other duties as from time to time may be assigned to him by the Membership Meeting.

Sec. 6. Powers and Duties of the Vice President shall have such powers, and shall perform such duties as may be assigned to him by the membership meeting. He shall also assume the powers and duties of the President of the Corporation in the President's absence.

Sec. 7. Powers and Duties of the Treasurer  The Treasurer shall have the custody of all the funds and the securities of the Corporation which may come into his hands, when necessary or proper; he shall endorse on behalf of the Corporation for collection, checks, notes and other obligations, and shall deposit the same to the credit of the Corporation in a bank of unquestioned standing; he shall sign all receipts and vouchers for payments made for the Corporation; jointly with one elected officer, preferably in all cases with the President, he shall sign all checks made out by the Corporation and shall pay out and dispose of same under the direction of the Board of Directors; he shall sign with the President all bills of exchange and promissory notes of the Corporation. Whenever required by the President, he shall render a statement of his cash account; he shall enter regularly, in books of the Corporation, to be kept by him for this purpose, full and accurate account of all moneys received and paid out by him on account of the Corporation; he shall at all reasonable times, exhibit his books and accounts to any Officer of the Corporation and to any member of the Board of Directors upon application at the office of the Corporation during business hours, and he shall perform all acts incident to the position of the Treasurer.

Sec. 8. Powers and Duties of the Assistant Treasurer  The Assistant Treasurer shall have such powers, and shall perform such duties, as may be assigned to him by the Board of Directors.

Sec. 9. Powers and Duties of the Secretary  The Secretary shall keep the minutes of all meetings of the Board of Directors, and also the minutes of the Annual or any Special Membership Meetings in books provided for that purpose; he shall attend to the giving and serving of all notices of the Corporation; he may sign with the President in the name of the Corporation; all contracts authorized, affirmed or ratified, and when so ordered by the President, he shall affix the Seal of the Corporation thereto; he shall have charge of such books and papers as the President may direct, all of which shall at a reasonable time, be open to the examination of any Officer, or any member of the Board of Directors upon application at the Office of the Corporation during business hours; and he shall in general perform all the duties incident to the office of the Secretary.

Sec. 10.  <u>Powers and Duties of the Assistant Secretary</u>  The Assistant Secretary shall have such powers) and shall perform such duties as may be assigned to him by the Board of Directors.

## ARTICLE XII

### COMMITTEES

Sec. 1.  Committee Chairmen, with their committees to assist the Board of Directors in the efficient management of the affairs of the Corporation shall be appointed or discharged at the discretion of the President.  Such chairmen shall attend any meeting of the Board of Directors, at which committee problems are being discussed.

## ARTICLE  XIII

### CORPORATE SEAL

Sec. 1. The Board of Directors shall provide a suitable Seal, containing the name of the Corporation, which Seal shall be in the charge of the Secretary. If and when so directed by the President, a duplicate of the Seal may be kept and be used by the Treasurer of the Corporation.

## ARTICLE XIV

### LEASING OF LOTS & COMMON AREAS / COMMUNITY PROPERTY

Sec. 1. The Board of Directors may internally subdivide the property of the G.A.S.L., Inc., at Yaphank, N.Y. (hereafter the property) into individual lots, the number, size and boundary of each to be determined by the Board. Lots leased to members can not be altered except by written agreement of the leasee.

Sec. 2.  The G.A.S.L., Inc., may lease such lots to persons qualified to be members of the G.A.S.L., Inc., and who prior to the commencement of the such lease becomes a member.

Sec. 3.  Parking on community roads overnight is prohibited.  All common areas / community property should remain vehicle free. The roadways, parking areas and all common areas shall not be used for  storage or long term parking (in excess of 24 hours without use) of any automobile, boat, trailer, camper, bus, truck or commercial vehicle.

Sec. 4.  Unlicensed recreational vehicles (mopeds, mini bikes, 4 wheel all terrain vehicles, dirt bikes, etc.) are not permitted on the common grounds / community property of  the GASL, Inc. property.

Sec. 5.  Individual homeowners / full members are required to obtain their own liability insurance for their structures and lot.

Sec. 6.  Illegal substances  are prohibited on GASL, Inc.  property. Anyone using or storing illegal substances on GASL, Inc.  property will immediately be asked to relinquish his or her membership.

**Page 9**

Sec. 7. Dogs - pets must be leashed or fenced in.

Sec. 8. The G.A.S.L., Inc., shall enter into a written lease agreement with such member on such terms as the Board of Directors shall specify and on a form provided by the G.A.S.L., Inc., for that purpose.

Sec. 9. No person, associate member or member may occupy or use any such lot without entering into a lease agreement with the G.A.S.L., Inc.

Sec. 10. No member who holds a lease may sub-lease such lot whether or not for consideration.

Sec. 11. No lot may be used for commercial purposes.

Sec. 12. No person may construct, or remove any structure on the property without the approval of the Board of Directors. A homeowner wishing to construct, or remove any structure must obtain appropriate permits and any other certificates required by law. A copy of ALL permits / certificates must be submitted to the Board of Directors. All homeowners / members are responsible in obtaining their own Certificate of Occupancy.

Sec. 13. Liens for the Non- Payment of Maintenance Fees, Taxes, outstanding debts - the G.A.S.L., Inc. shall have a lien against each home for its unpaid taxes, maintenance fees, and outstanding debts, to be entered into 90 days after the due date of such outstanding debt. The Board of Directors may foreclose the lien in the same matter as a mortgage on real property and in doing so shall be entitled to recover all costs incurred including reasonable attorney's fees. The liability of each Homeowner / full member for the payment of taxes, maintenance fees and outstanding debts thereafter assessed against his/her home shall terminate upon a sale, transfer or conveyance of such home in accordance with the G.A.S.L., Inc. by laws. Upon a resale, transfer etc. the purchaser / new homeowner / member of the home shall be liable for the payment of unpaid debts assessed against such home prior to the acquisition of such home by the purchaser.

Sec. 14. The homes or bungalows constructed on the property are the personal property of the member who constructs them. Such member may give, bequeath or sell their homes or bungalows to another person, subject to article XIV, section 17 of these by-laws.

Sec. 15. Any person who owns such a structure shall be given the first option to lease the lot upon which it stands or to renew a prior lease, providing such persons meets the requirement of these by-laws.

Sec. 16. Plants, shrubs, trees located on community property / common areas shall not be altered or removed without the Board of Directors approval. Any member wishing to remove a tree from their lot must receive permission from the Grounds Committee Chairperson prior to tree removal.



Sec. 17   Any person who becomes an owner of a bungalow or home located on the property who is not a member of the G.A.S.L., Inc., shall and must within 30 days of the time they become an owner:

    a.) Apply for member ship in the G.A.S.L., Inc.

    b.) Sell their interest to a person qualified to be a member. Advertising in consumer or trade journals, publications are prohibited, for sale signs are also prohibited. Posting a for sale sign inside the community bulletin board is permitted.

    c.) Remove the structure from the property.  The site where the structure has been removed from shall be left clean of all debris and level with the surrounding area.

    d.) Transfer the structure to the G.A.S.L., Inc.  The failure to comply with this section will be considered the abandonment of the structure.

Sec. 18. A member who fails to renew his lease or who loses his membership status shall have 90 days to dispose of his home or bungalow as provided in Section 10.

Sec. 19.  Any structure which is abandoned for 90 days shall be considered the property of the G.A.S.L., Inc., who may dispose of it as it deems appropriate.

Sec. 20. Default – In the event a homeowner / member does not pay any sums, charges or assessments required to be paid when due, the Board of Directors, acting in behalf of the membership shall notify the homeowner/member, if any, of such home.  If such sum, charge, or assessments shall remain unpaid for 90 days after the giving of such notice, the Board may foreclose the lien encumbering the home as a result of the non-payment of the required moneys. In the event the owner of a home does not pay the assessment required to be paid by him/her within thirty (30) days of its due date, said sum shall bear interest at the maximum amount permitted by the State of New York from its due date and said Homeowner shall be liable for the corporations reasonable costs and a reasonable attorney's fee incurred by it incident to the collection or enforcement of such lien.

## ARTICLE XV

Sec. 1 The By-Laws can only be amended, created or repealed by a vote of three-quarters of the members present and entitled to vote at the annual meeting or a special meeting.  A Vote may only be taken at a special meeting when notice of the proposed change is given at least 30 days in advance with the meeting notice.

Sec. 2 All former By-laws are hereby repealed.

This edition of the G.A.S.L., Inc. By-Laws / Constitution was accepted as written by the Membership at the Annual General Membership Meeting held on May 30th, 1998.

_____ 7/28/98          _norma morlock_ 7/28/98
Adalbert Theune, President         Date          Norma  Morlock, Secretary      Date